UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                              Criminal No. 09-183 (ADM/FLN)

             Plaintiff,

      v.                                            **ORDER & REPORT AND**
                                                **RECOMMENDATION**

**Joseph Paul Young,**

             Defendant.

_____

Allen A. Slaughter & Andrew S. Dunne, Assistant United States Attorneys, for Plaintiff.
Manvir K. Atwal & Ryan P. Garry for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on April 6,

2011 on Defendant's Pretrial Motion to Suppress Eyewitness Identifications (ECF No. 14) and

Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 19).

At the hearing, the Government offered testimony from Timothy Kitta, Monte Keiper, Todd

Hadlock, James Berni and Drew Helms. The Court admitted thirteen exhibits into evidence.[1] Both

parties submitted post-hearing briefs. (ECF Nos. 34, 36, 37.) The matter was referred to the

---

[1]Def. Ex. 1: copy of except from Rogersville Police Department "Policy and Procedures Manual;" Gov't Ex. 1: copy of photograph and driving record for Joseph Paul Young; Gov't Ex. 2: photograph of vehicle license plate; Gov't Ex. 3: FBI "Consent to Search" form for 2005 Chevy Cavalier; Gov't Ex. 4: FBI "Consent to Search" form for specific address on Elm Grove Rd., Rogersville, MO; Gov't Ex. 5: "Property Record;" Gov't Ex. 6: "Vehicle Record;" Gov't Ex. 7: "Missouri State Highway Patrol General Order," subject: "Removal and Inventory of Vehicles;" Gov't Ex. 8: "Photo Lineup" bearing six color photographs "Viewed by Amanda Rodriguez;" Gov't Ex. 9: "Photo Lineup" bearing six color photographs "Viewed by Melissa Henning;"  Gov't Ex. 10: copies of photographs individually labeled "10-A" through "10-C" and "10-E" through "10-G," and a copy of a page of handwritten signatures and initials dated 9/18/08 labeled "10-D;" Gov't Ex. 11: copies of photographs individually labeled "11-A" through  "11-G"  bearing handwritten numbers 1 through 6 (11-F and 11-G are both number "6"); and Gov't Ex. 12: "Application and Affidavit for Search Warrant," "Search Warrant," and "Receipt for Property Received/Returned/Released/ Seized" for DNA Sample from Joseph Paul Young.

undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the Court recommends Defendant's suppression motions be **DENIED** and Defendant's request for impeachment evidence pertaining to Special Agent Burlew be **GRANTED**.

## I.   FINDINGS OF FACT

**A.   Testimony**

**1.   Timothy Kitta**

At the hearing, Rogersville, Missouri Police Officer Timothy Kitta testified about the pursuit of Joseph Paul Young ("Defendant") on August 20, 2008. (Tr. 8.) At approximately 9:00 p.m. on that date, Officer Kitta was "sitting in [his] patrol car right at the police department entrance listening to the radio traffic coming from dispatch about an FBI agent requesting assistance." (Tr. 8.) Dispatch notified local officers that an FBI agent "was following a suspected bank robber" and "was requesting assistance on a traffic stop." (Tr. 8.) Dispatch also provided a description of the vehicles driven by the suspect and the FBI agent as well as their location and direction of travel. (Tr. 8.) Officer Kitta was positioned nearby and, shortly after hearing the dispatch transmission, he "observed the suspect vehicle [a dark-colored Chevrolet Silverado pick-up truck] being followed by a white Impala, continuing northbound through the Center Street intersection." (Tr. 9.) Officer Kitta then "hit [his] lights and sirens and immediately headed for their location." (Tr. 9.) When he approached, Officer Kitta noticed that the vehicles "had stopped just north of the intersection at Center and Mill, right-hand side of the road just before the railroad tracks." (Tr. 9.) He "pulled in behind the agent's car." (Tr. 9.) Officer Kitta  then observed the agent, who was wearing a jacket "that had 'FBI' on it," running "from the suspect's vehicle back to his vehicle as the suspect's vehicle pulled away," leaving at "a high rate of speed." (Tr. 10.) The two law enforcement officers

then pursued, with the FBI agent in primary position and Officer Kitta behind the agent in secondary position. (Tr. 11.) Officer Kitta testified that he reached top speeds of "75 to 95 miles an hour," but the Silverado and the Impala were going even faster, and on "several occasions" Officer Kitta "lost sight of them." (Tr. 11.) The Silverado exceeded posted speed limits and crossed double yellow lines in no passing zones during the chase. (Tr. 11, 12.)

The vehicle pursuit ended on the left-hand side of the road (facing oncoming traffic), near a low-water bridge. (Tr. 12.) Officer Kitta observed the Silverado and the Impala on the left side of the road as well as "a white male running from" the Silverado "along the wood line west into the woods." (Tr. 12.) Officer Kitta testified that the suspect driver left the Silverado door open after "he bailed from the vehicle" on foot and fled into the woods. (Tr. 13.) Law enforcement did not pursue on foot, but rather requested tracking hounds and additional units to "set up a perimeter." (Tr. 14.) Officer Kitta and the FBI agent then "cleared the truck" to make sure there were no hostages or weapons hidden in the vehicle. (Tr. 14.) Officer Kitta later ran the Silverado's the license plate number and learned that the truck was registered in Defendant's name. (Tr. 15-16.) Officer Kitta further explained that he was charged with locating "a local agency to tow the vehicle." (Tr. 16.) He testified that, although the Silverado remained at the scene for "two to three hours," law enforcement did not "leave the vehicle" before it was towed to State Highway Patrol "Troop D Headquarters" in Springfield, Missouri. (Tr. 16–17.)[2]

That night, officers were unable to apprehend Defendant. (Tr. 15.) At no time did anyone attempt to claim the Silverado. (Tr. 17.)

### 2.   Monte Keiper

---

[2]Agent Helms testified that, two or three days after the tow, Special Agent Burlew searched the vehicle at Troop D Headquarters and recovered items of evidentiary value. (Tr. 78, 79, 81.)

Monte Keiper, Special Agent with the FBI, testified regarding the search of a residence on Elm Grove Road in Rogersville, Missouri on August 21, 2008. (*See* Gov't Ex. 4.) On that date,[3] Agent Keiper interviewed Defendant's sister, Sarah Young. (Tr. 29.) Ms. Young revealed that Defendant had been staying at her home on Elm Grove since the previous month. (Tr. 32.) She stated that Defendant was not working or paying rent but that, "within the last couple of months," she had seen him with "large amounts of money." (Tr. 31–32.) Agent Keiper asked Ms. Young for consent to search her residence, which she provided. (Tr. 33 ("We just asked her if she would be willing to allow us to search, and she didn't have a problem with that.")) Ms. Young then signed a "Consent to Search" form, which was witnessed by Agent Keiper and another FBI agent and dated August 21, 2008. (Gov't Ex. 4.)

### 3. Todd Hadlock

Missouri State Highway Patrol Trooper Todd Hadlock testified regarding the circumstances surrounding Defendant's arrest on August 28, 2008 and the searches conducted incident thereto. (Tr. 42.) At approximately 8:03 a.m., while on duty on that date, Trooper Hadlock "came up behind" a 1989 Dodge Shadow, which he "paced" at 35 miles per hour on Interstate 44. (Tr. 43–44 ("[M]y speedometer was right at 35 and I was not gaining or losing track of the vehicle.")) Trooper Hadlock testified that the posted speed limit on Interstate 44 is 70 miles per hour, while the minimum speed is 40 miles per hour. (Tr. 44.) He also observed that "there was no rear license plate and there was a temporary paper tag attached to the . . . rear window of the vehicle" with an illegible expiration date. (Tr. 43.)

Trooper Hadlock then activated his emergency lights and conducted a traffic stop on the

---

[3] In light of Government Exhibits 3 and 4, it appears the interview by Agent Keiper and subsequent search took place on August 21, 2008, not on August 20, 2008, as stated at the hearing. (*See* Tr. 32.)

vehicle. (Tr. 44.) He approached the car, explained his reason for the stop, and identified the driver as Defendant with his Missouri driver's license. (Tr. 45–46.) After performing a "radio check" through his dispatcher, who ran a standard warrant check through the Missouri Uniform Law Enforcement System ("MULES"), Trooper Hadlock discovered that Defendant "was positive for three warrants." (Tr. 46–47.) Once he had confirmed the warrants, Trooper Hadlock placed Defendant under arrest. (Tr. 47–48.) Trooper Hadlock then searched Defendant and recovered "a large sum of cash, money" from his person. (Tr. 48; Gov't Ex. 5.) When other local law enforcement officers arrived on the scene, they "[took] control of the vehicle and [performed] an inventory search" pursuant to Missouri State Highway Patrol policy. (*See* Tr. 49; 51; Gov't Exs. 6 and 7.) At the request of the FBI, Trooper Hadlock then transported Defendant to the Greene County Jail. (Tr. 49.)

### 4.    James Berni

FBI Special Agent James Berni testified regarding his involvement in the investigation of a September 18, 2007, robbery at the Washington County Bank in Maplewood, Minnesota. (Tr. 56–57.) Agent Berni testified that, on September 8, 2008,  he "showed a photo spread of subjects to two different witnesses." (Tr. 57.) The photo array had been constructed by detectives with the Sioux Falls Police Department in connection with a bank robbery that had occurred in Sioux Falls, South Dakota. (Tr. 57, 62; Gov't Exs. 8 and 9.)[4]

Agent Berni met with witnesses Amanda Rodriguez and Melissa Henning "away from everybody else." (Tr. 58.) The two witnesses were separately shown the photo array. (Tr. 58.) Agent

---

[4] Government Exhibits 8 and 9 are both copies of the same photo array, each of which contains six photos of dark-haired, white males with facial hair on a single page. (Gov't Exs. 8 and 9.)

Berni asked them each to read the advisory printed on the page[5] and added: "if you see the individual that robbed the bank on that day, let me know; if you don't see it [sic], that's fine. No pressure to pick an individual on here. If he is not on here, he is not on here." (Tr. 58.)

After providing this instruction to Amanda Rodriguez, she "took a second to look at the photos and then pointed to photograph number 2 and said that that was the individual who robbed them." (Tr. 59.) Ms. Rodriguez circled photograph number 2, signed her initials on a line directly below the image, and wrote her name and the date on the bottom of the array. (Gov't Ex. 8; Tr. 59–60.) Agent Berni did not inquire as to Ms. Rodriguez's level of certainty in her identification. (Tr. 63.)

Agent Berni utilized the same procedure and provided the same instruction to witness Melissa Henning when he presented her with a second, identical photo array. (Gov't Ex. 9; Tr. 60.) Ms. Henning then "looked at the photos and said that she couldn't remember what the robber looked like because it had been so long ago." (Tr. 61.) Agent Berni then thanked Ms. Henning for her time and filled in the "shown by," "viewed by" and "date" lines on the array in his own handwriting. (Gov't Ex. 9; Tr. 61.)

## 5.    Drew Helms

FBI Special Agent Drew Helms testified regarding his involvement in the investigation of a bank robbery that occurred on April 16, 2008 in Luverne, Minnesota. (Tr. 65–66.) On that date, Agent Helms interviewed witnesses at the bank, who provided descriptions of the suspect. (Tr. 66.)

---

[5]The photo arrays each contain the following advisory on the face of the document in the lower, left-hand corner: "You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photographs contain the picture of the person who committed the crime. You are not obligated to  identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses nor indicate in any way that you have identified someone." (Gov't Exs. 8 and 9.)

The "victim teller," Erin Sandstede, described the bank robber as "a white male between 35 and 37 years old, about 5'10" with an average build" and "dark eyes." (Tr. 67.) She described the clothing he was wearing as "a light blue baseball cap with a red, flannel, long-sleeved shirt." (Tr. 67.) A second witness, Laura Luitjens, who had been working the "drive-up area of the bank," described the robber as a white male, 6 feet tall, with "a 'puny' build with a dark-colored hat, dark hair, dark eyes, and a mustache, and a plaid, long-sleeved, flannel shirt." (Tr. 67–68.) A third witness, Debra Lusty, who had been helping a drive-through customer at the time of the robbery, described the suspect as a "[w]hite male, 5'10", about 180 pounds, dark hair, mustache." (Tr. 68.) Agent Helms testified that he believed "she thought he had a light-colored baseball hat on and then a plaid, flannel shirt." (Tr. 68.) Additionally, all three of the tellers "described some sort of tight-fitting glove on his left hand." (Tr. 68.)

On September 18, 2008, Agent Helms returned to the bank with two photo arrays.[6] (Tr. 71.) On that date, Agent Helms and Sheriff's Deputy Jeff Wienke presented the array to witnesses at the bank in a conference room "away from everyone else" that "had a door that could close." (Tr. 72–73.) Agent Helms testified that he told the witnesses "that I have several images for them to review, that they can look at them in any manner that they choose, and they should not feel compelled to identify anyone. The subject may or may not be in the line-up and that if they do recognize someone to identify that image and let me know where they recognize them [sic] from." (Tr. 72.)

Erin Sandstede was the first witness to view the images in the array marked as Government

---

[6] Both photo arrays consist of six photographs, each photograph on a separate page. (Gov't Exs. 10 and 11.) Each of the photographs depicts a white male with dark hair and facial hair. (Gov't Exs. 10 and 11.) Both arrays contain the same photographs, however, Agent Helms placed Defendant's image at page three in the first array (Gov't Ex. 10) and moved Defendant's image to page four in the second array (Gov't Ex. 11).

Exhibit 10. (Gov't Ex. 10A-10C and 10E-10G; Tr. 73.) She reviewed the photos, set aside Government Exhibit 10-C and said: "Looks like him." (Gov't Ex. 10-C; Tr. 73–74 (Ms. Sandstede "went through the images and identified one in position number 3 as the subject that robbed the bank.")) Agent Helms testified that he then instructed Ms. Sandstede "to place her intials lightly on the back of that individual's sheet because I still needed to show [the array] to another teller." (Tr. 73.) Agent Helms further told her "not to communicate with Laura at all that there was or was not an identification." (Tr. 73.)

Witness Laura Luitjens then reviewed the same array. (Tr. 74; Gov't Ex. 10.) Agent Helms testified that Ms. Luitjens "also went through all the images and  put the image of Joseph Young aside and said, 'I recognize him.' And I said, 'From where?' She said, 'From the robbery.'" (Tr. 74.) Per Agent Helms' instructions, Ms. Luitjens then signed her name to the back of the image that she had selected (which, at that time, also bore the initials of Ms. Sandstede). (Tr. 74; Gov't Ex. 10-D.) Agent Helms and Deputy Wienke also signed and dated the back of the image. (Tr. 74; Gov't Ex. 10-D.)  After Ms. Luitjens had identified Defendant and signed her name, Agent Helms took the image back to Ms. Sandstede to provide her full signature where she had previously placed her initials. (Tr. 86; Gov't Ex. 10-D.)

Debra Lusty was the final witness to view a photo array. (Tr. 75.) Instead of reviewing the same array, however, Agent Helms presented her with Government Exhibit 11. (Tr. 75; Gov't Ex. 11.) Agent Helms testified that Ms. Lusty looked at all the images and set aside image numbers two and four, stating that "they both had similar characteristics." (Tr. 75; Gov't Exs. 11-B and 11-D.) She also "commented that the subject in number four had a crooked nose and that she specifically remembered that the bank robber had a crooked nose, and that the person in number four had the same dark-colored hair as the bank robber. She just couldn't be 100 percent sure on the

identification." (Tr. 76.)

**B.      DNA Search Warrant**

FBI Special Agent Marco D. Rodriguez requested a search warrant from the United States District Court for the District of West Virginia for four DNA samples to be taken from Defendant's mouth. (Gov't Ex. 12.) Agent Rodriguez served as the affiant for the warrant application and recited the following events in support of probable cause.

Agent Rodriguez summarized the events of three bank robberies that occurred in Minnesota on September 18, 2007,[7] September 25, 2007 and January 26, 2008, respectively as well as a bank robbery that occurred on August 19, 2008 in West Virginia. (Gov't Ex. 12.) Agent Rodriguez provided a physical description of the suspect for all three Minnesota robberies as "a white male, 30-40 years old, brown eyes, brown hair . . . approximately 6'0" tall, 180 to 200 pounds"[8] with facial hair. (*See* Gov't Ex. 12 ¶¶ 5, 7, 10.) He also described clothing worn by the suspect in each of the three Minnesota robberies.  (*See* Gov't Ex. 12 ¶¶ 5, 7, 10.) Agent Rodriguez further stated that "information gathered during the investigation" of the West Virginia robbery "identified [Defendant] as the robber." (Gov't Ex. 12 ¶ 12.) He also discussed Defendant's arrest in Missouri on August 28, 2008 and noted that bills found in Defendant's possession at the time of his arrest matched serial numbers "from the bundle of bait money" taken from the West Virginia bank. (*See* Gov't Ex. 12 ¶ 13.)

Agent Rodriguez further described the search conducted at Ms. Young's house and the clothing retrieved therefrom. (Gov't Ex. 12 ¶ 14.)  The items seized from the house on Elm Grove

---

[7] The same Washington County Bank robbery in Maplewood, Minnesota mentioned above.

[8] The physical descriptions from the September 25, 2007 and January 26, 2008 robberies limit the suspect's weight range to "180 to 190 pounds." (Gov't Ex. 12 ¶¶ 7, 10.) The January 26, 2008 description also limits the suspect's age range to "35-40 years old." (Gov't Ex. 12 ¶ 10.)

included: "a light gray hooded sweatshirt, which appears similar to the one worn by the robber during the January 26, 2008, robbery of the US Bank" in "Bloomington, Minnesota; and a gold baseball cap with a red University of Minnesota 'M' on the front, which appears similar to the one worn by the robber in both the September 18, 2007 robbery of the Washington County Bank" in "Maplewood, Minnesota and the September 25, 2007 robbery of the TCF Bank" in Fridley, Minnesota. (Gov't Ex. 12 ¶14.) Agent Rodriguez also mentioned the photographic array presented at the Maplewood, Minnesota bank on September 8, 2008 to the victim teller, who, when viewing his photograph, described Defendant as having "a similar face shape, and eye placement as the robber." (Gov't Ex. 12 ¶ 15.)

Agent Rodriguez also compared photographs of Defendant "from the Missouri Division of Motor Vehicles and booking photographs taken on August 28, 2008 to bank surveillance photographs from each of the bank robberies." (Gov't Ex. 12 ¶16.) Agent Rodriguez stated: "Based on my comparison of the photographs, the man in each of the bank surveillance photographs appears to be [Defendant]." (Gov't Ex. 12 ¶ 16.) The affidavit further states that two tracking devices recovered after the robbery of the TCF Bank contained "sufficient DNA samples" to perform DNA analysis "if a known sample of the robber's DNA was submitted for comparison." (Gov't Ex. 12 ¶ 8.)

United States Magistrate Judge Mary E. Stanley signed the warrant at 3:03 p.m. on January 30, 2009, and law enforcement took two "DNA swabs" from the inside of Defendant's cheek on February 2, 2009. (Gov't Ex. 12.)

## II.  CONCLUSIONS OF LAW

### A.   Search of Chevrolet Silverado

Defendant argues that the search of the Chevrolet Silverado violated the Fourth Amendment

because Defendant did not abandon the vehicle and the truck was not inventoried at the scene, but rather at Troop D headquarters, two or three days after having been towed, in contravention of Rogersville Police Department policy. Because this Court finds that the Silverado was abandoned at the time of the search, suppression of the evidence seized pursuant thereto is not warranted.

"Whether a defendant has a constitutionally protected expectation of privacy involves a two-part inquiry'-the defendant must show that (1) he 'has a reasonable expectation of privacy in the areas searched or the items seized,' and (2) 'society is prepared to accept the expectation of privacy as objectively reasonable.'" *United States v. James*, 534 F.3d 868, 872–73 (8th Cir. 2008), quoting *United States v. Hoey*, 983 F.2d 890, 892 (8th Cir. 1993). A warrantless search of abandoned property does not implicate the Fourth Amendment because "any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d 600, 603 (8th Cir. 1997), citing *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994). Abandonment turns on "whether the defendant in leaving the property has relinquished [a] reasonable expectation of privacy so that the search and seizure is valid.'" *Tugwell*, 125 F.3d at 603, quoting *Hoey*, 983 F.2d at 892–93. Furthermore, whether abandonment of property has occurred must be determined "on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Tugwell*, 125 F.3d at 603, citing *United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993). "This determination is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property." *Tugwell*, 125 F.3d at 603, quoting *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).

Here, Defendant relinquished any reasonable expectation of privacy in the Silverado truck and its contents when he fled from the vehicle on August 20, 2008. *See United States v. Walton*, 538 F.2d 1348, 1354 (8th Cir. 1976) (finding that, because the defendant fled from the scene and

abandoned his car when law enforcement arrived, the "subsequent warrantless search and examination of the vehicle on the scene" did not violate "any fourth amendment right"). Defendant left the truck, on a public thoroughfare with the door ajar, in full flight. He ran into the woods on foot after engaging law enforcement in a high speed chase, a pursuit which resulted from an attempted traffic stop of Defendant by an FBI agent. Defendant neither returned to the vehicle on that date nor attempted to claim the vehicle at any other time.

Defendant's actions were not consistent with those of someone who maintains a continued expectation of privacy in his property. Defendant abandoned the truck; thus any search thereof did not violate the Fourth Amendment. Consequently, the evidence seized from the Silverado is admissible. Because the evidence is admissible on this basis, the Court need not consider Defendant's argument regarding the applicable law enforcement policy for inventory searches.

**B.    Search of Residence on Elm Grove in Rogersville, Missouri**

Defendant rests on the record and has presented no argument disputing the admissibility of the evidence seized pursuant to a search of the residence on Elm Grove in Rogersville, Missouri. Consent to search was given by Defendant's sister, Sara Young, who lives at the residence. Any evidence seized pursuant to the search of her residence on Elm Grove is admissible.

**C.    Search Incident to Arrest**

Defendant also rests on the record with respect to the search incident to his arrest on August 28, 2008. Trooper Hadlock testified that he conducted a traffic stop on Defendant's vehicle for traveling under the minimum speed and driving a vehicle with unreadable temporary tags. He then arrested Defendant as a result of his outstanding warrants. Other law enforcement officers ultimately conducted an inventory search on the vehicle at the scene pursuant to Missouri State Highway Patrol policy. (*See* Gov't Ex. 7.) All evidence seized from Defendant's person and the vehicle at the time

of his arrest is admissible.

**D.      Eyewitness Identifications**

Defendant further claims that the photographic identifications of Defendant by eyewitness in this case were so unnecessarily suggestive as to deprive Defendant of due process of law.

Due process requires suppression of a pretrial identification "if, under the totality of the circumstances, the confrontation procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to be fundamentally unfair to the defendant." *Harris v. Wyrick,* 644 F.2d 710, 712 (8th Cir. 1981), citing *Stovall v. Denno*, 388 U.S. 293, 302 (1967). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.*

"A two-part test governs the admissibility of identification evidence." *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003). First, the Court must determine whether the identification procedures were "impermissibly suggestive." *Id.* An array is not unnecessarily suggestive when there are "no differences in appearance that tend to isolate" a suspect's image. *United States v. Granados*, 596 F.3d 970, 974–75 (8th Cir. 2010). Second, if the procedures were impermissibly suggestive, the Court must "examine the totality of the circumstances to determine whether the suggestive procedures created a very substantial likelihood of irreparable misidentification." *Williams*, 340 F.3d at 567. In the second analysis, the Court must balance the following five factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of

certainty demonstrated at the confrontation, and the time between the crime and the confrontation."
*Id.*, citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

### 1.      September 8, 2008 Witness Identification

Defendant asserts that the photo spread utilized by Special Agent Berni on September 8, 2008 at the Washington County Bank in Maplewood, Minnesota was impermissibly suggestive. Agent Berni twice utilized a six person photo array, compiled by the Sioux Falls Police Department. The spread contains six photographs of dark-haired, white males with facial hair. (Gov't Exs. 8 and 9.) Each man pictured has a moustache. (Gov't Exs. 8 and 9.) All images were placed on a single page. The array contains no identifying information with respect to any image. Ultimately, witness Amanda Rodriguez identified Defendant's image as that of the bank robber. (Gov't Ex. 8.)

Although some individuals pictured in the array have more facial hair than others, the Court finds that such a distinction between the individuals is not impermissibly suggestive. *See Schawitsch v. Burt*, 491 F.3d 798, 803 (8th Cir. 2007) ("Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times.") Additionally, there is no evidence of suggestion or prompting of the witnesses by law enforcement during the identification process. *See United States v. Boston*, 494 F.3d 660, 666 (8th Cir. 2007); *United States v. Johnson*, 56 F.3d 947, 954 (8th Cir. 1997). Each witness was given an opportunity to review the array away from others. Additionally, Agent Berni told each of the witnesses that the bank robber may or may not be pictured in the array and that they need not identify anyone. That the witnesses reviewed the array one year after the robbery occurred is immaterial to whether the array itself or the procedures utilized by the agents were impermissibly suggestive. The Court finds the array was not impermissibly suggestive.

14

2.      **September 18, 2008 Witness Identification**

Defendant also argues that the photo arrays utilized by Special Agent Helms on September 18, 2008 were impermissibly suggestive. Agent Helms utilized a six page array, which displayed one photograph on each page. (Gov't Exs. 10 and 11.) He placed Defendant's image at position number three in the array presented to the first two witnesses (Gov't Ex. 10), and then moved it to position number four in the second array, which he presented to the third witness (Gov't Ex. 11). Two of the three witnesses ultimately identified Defendant.

Defendant first claims that the arrays were suggestive because two of the individuals in the array "were not the same age as the robber." (ECF No. 34 at 24.) Any age difference between Defendant and others in the array does not merit a finding of impermissible suggestiveness in this case, where the array utilized was made up of photographs of individuals "with similar physical characteristics and no other identifying information." *Boston*, 494 F.3d at 666 (finding an array was not improper where two of six individuals pictured "were significantly younger" than the defendant). The Court finds this argument unpersuasive.

Defendant also argues that "the first two witnesses were 'affirmed' in their identification by seeing each others' signature and initials" and "by seeing the agent's signature." (ECF No. 34 at 24.) There is no evidence that Laura Luitjens turned Defendant's photograph over while reviewing the images or that she saw the initials of Erin Sandstede before making her identification. Also notably, the agents and Ms. Sandstede did not provide full signatures until after Ms. Luitjens had made her identification. (*See* Gov't Ex. 10-D.)

Moreover, there is no evidence that the process utilized by Agent Helms was impermissibly suggestive. The reviews were conducted in a separate room of the bank, away from others. Agent

15

Helms also instructed the witnesses that the bank robber may or may not be pictured in the array. In addition, each witness was told that she need not identify anyone. There is also no evidence that Agent Helms "made any suggestive sounds or gestures during the photographic lineup." *Boston*, 494 F.3d at 666.

This Court finds that neither the photo arrays nor the identifying procedures were impermissibly suggestive sufficient to deny Defendant of his right to due process. Because neither array was impermissibly suggestive, the Court does not reach the second prong of the analysis. *See Granados*, 596 F.3d 970, 974 (8th Cir. 2010); *United States v. Gipson*, 383 F.3d 689, 698 (8th Cir. 2004). The identifications are admissible.

### E.    DNA Search Warrant

The final issue at hand is whether the search warrant application in this case could support the issuing magistrate judge's probable cause determination. Defendant challenges a search warrant issued for a DNA sample from Defendant (Gov't Ex. 12) and contends that the supporting affidavit was insufficient to establish probable cause. (ECF No. 34 at 27.)

Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the magistrate with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236–39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *See id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* Veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S.

16

325, 328 (1990). Whether probable cause exists depends on the totality of the circumstances.  *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002).  In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together.  *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

Given the totality of the circumstances in this case, probable cause existed to support the issuance of the search warrant for a DNA sample from Defendant. The application summarizes a series of bank robberies that occurred in Minnesota and the clothing witnesses described the suspect wearing as well as clothing seized from Defendant's sister's residence in Rogersville, Missouri (where Defendant had been staying). Specifically, witnesses stated that the robber in the Maplewood and Fridley robberies was wearing a yellow, plaid shirt and a gold University of Minnesota hat bearing a red "M." (Gov't Ex. 12 ¶¶ 5, 7.) Pursuant to a search of Ms. Young's residence in Rogersville, Missouri, law enforcement found such a hat[9] and a "light green and gray checked flannel shirt with an attached gray hooded sweatshirt," which Agent Rodriguez described as "similar to the one worn by the robber" in the January 26, 2008 robbery. (Gov't Ex. 12 ¶ 14.)

The affidavit also notes a witness' comment, upon viewing Defendant's image in a photo array on September 8, 2008, that he "had a similar face shape, and eye placement as the robber" at the Maplewood bank. (Gov't Ex. 12 ¶ 15.) Agent Rodriguez also discussed the West Virginia bank robbery and Defendant's arrest, as well as the matching bait bills found in his possession at that time. (Gov't Ex. 12 ¶¶ 11–13.) Agent Rodriguez further compared photographs of Defendant to bank surveillance photographs from each of the bank robberies and stated that "the man in each of the

---

[9] While hats with such a symbol and color scheme may be commonly found in the State of Minnesota, it would be logical to assume that they are found in Missouri far less often.

bank surveillane photographs appears to be [Defendant]." (Gov't Ex. 12 ¶ 16.) These facts, taken together, establish more than a "fair probability" that Defendant's DNA would match that found on the tracking devices in connection with the Fridley bank robbery. *See e.g. United States v. Willis*, 2011 WL 1100127 at *1 (D. Minn. Mar. 14, 2011).

In sum, this Court concludes that Agent Rodriguez's application and affidavit are sufficient to support a finding of probable cause for the warrant to issue.

## F.     Impeachment Evidence Regarding Agent Burlew

Lastly, Defendant seeks an order requiring the Government to disclose Special Agent Burlew's employment records pertaining to any disciplinary or investigative action taken as a result of his alleged misconduct in this case.

The Court concludes that the Government's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) and their progeny are sufficient to require the Government to produce relevant impeachment evidence. "The government has an obligation to disclose evidence that is favorable to the accused and material to either guilt or punishment, and this duty extends to impeachment evidence." *United States v. Jeanpierre*, 636 F.3d 416 (8th Cir. 2011); *see United States v. Bagley*, 473 US. 667, 676 (1985). The Court finds that Defendant has made a plausible claim that such records (if they exist) contain exculpatory material based upon Agent Burlew's decision to interview Defendant despite allegedly knowing that Defendant was represented by counsel at the time of the interview. *See United States v. Ben M. Hogan Co.*, 769 F.2d 1293, 1299, *cert. granted, judgment vacated by United States. v. Ben M. Hogan Co.*, 478 U.S. 1016 (1986). To the extent Defendant seeks production of internal FBI investigatory or disciplinary employment records generated as a result of any misconduct by Agent

18

Burlew in connection with the instant case, the motion should be granted, provided such records exist.

### III.    ORDER

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's request for impeachment evidence related to Special Agent Burlew is **GRANTED** to the extent that such evidence exists in the form of disciplinary or investigatory employment records. Production shall be limited, however, to only those records generated as a result of any allegations of misconduct by Agent Burlew in connection with the investigation in this case. To the extent Defendant seeks any additional documents or records, that request is **DENIED**.

### IV.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1)    Defendant's Pretrial Motion to Suppress Eyewitness Identifications (ECF No. 14) be **DENIED**; and

2)    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 19) be **DENIED**.

DATED: May 23, 2011                              *s/ Franklin L. Noel*
                                                 FRANKLIN L. NOEL
                                                 United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 6, 2011**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is

19

made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 6, 2011,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.